USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/15/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
RUFUS GRAHAM,                                    :
                                                 :       09 Civ. 4616 (RO) (JLC)
                        Petitioner,              :
                                                 :       REPORT AND
        -v.-                                     :       RECOMMENDATION
                                                 :
ADA PEREZ, Superintendent,                       :       (Non-ECF Case)
Downstate Correctional Facility,                 :
                                                 :
                        Respondent.              :
--------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To the Honorable Richard Owen, United States District Judge:**

## I.   INTRODUCTION

Petitioner Rufus Graham ("Graham" or "Petitioner") seeks a writ of habeas corpus under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254, challenging the Appellate Division's affirmance of his June 24, 2005 conviction on five counts of Burglary in the Second Degree (New York Penal Law § 140.25(2)), six counts of Burglary in the Third Degree (id. § 140.20), one count of Forgery in the Second Degree (id. § 170.10(1)), and one count of Criminal Possession of a Forged Instrument in the Second Degree (id. § 170.25). Memorandum of Law in Support of Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, filed May 15, 2009 ("Pet'r Mem. of Law") at 1 (Doc. No. 4). Graham, serving 13 concurrent, indeterminate sentences of 25 years to life, is currently incarcerated at Downstate Correctional Facility in Fishkill, New York. Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus By a Person in State Custody, filed May 15, 2009 ("Pet.") (Doc. No. 2).

On May 15, 2009, Graham filed a petition for writ of habeas corpus in this Court, asserting three claims: (1) the police violated his right to remain silent, in violation of the Fifth

Amendment, when they failed to honor his invocation of his Miranda rights; (2) statements made after he invoked his right to remain silent were obtained involuntarily and should not have been admitted at trial, in violation of the Fifth, Sixth, and Fourteenth Amendments; and (3) the trial court erred in sentencing him as a persistent felony offender, in violation of the Sixth and Fourteenth Amendments. Pet. at 6-9.

By letter dated April 19, 2010, Respondent Ada Perez ("Respondent") requested that I hold my report and recommendation in abeyance pending the Second Circuit's decision, en banc, in Besser v. Walsh, 601 F.3d 163 (2d Cir. 2010), regarding the constitutionality of New York's persistent felony offender statute. On April 21, 2010, I granted counsel's request. (Doc. No. 21). On October 18, 2010, the Second Circuit rendered its decision, and certiorari was denied on March 21, 2011. See Portalatin v. Graham, 624 F.3d 69 (2d Cir. 2010), cert. denied, --- S. Ct. ---, 2011 WL 196837 (Mar. 21, 2011).

For the reasons set forth below, I recommend that the Petition be DENIED.

## II.    BACKGROUND

Beginning in July, 2004, Graham was tried before the Honorable James A. Yates, J.S.C. in State Supreme Court, New York County. Graham did not testify, nor did he call witnesses or present any other evidence on his behalf. The prosecution called several witnesses, including a number of New York City Police officers. The following facts are derived from the evidence presented by the prosecution.

### A. The Crimes

In Spring 2003, both the Upper East Side and Upper West Side of Manhattan were plagued with a series of residential and commercial burglaries. The media dubbed the perpetrator "Spiderman" for his ability to scale walls, climb scaffolding, and leap across

rooftops.  According to the evidence presented at trial, the burglary spree began on May 7, 2003, and ended with Graham's capture, on June 11, 2003.

        1.  <u>233 Fifth Avenue – May 7, 2003</u>

In May 2003, scaffolding covered 233 Fifth Avenue, a five-story commercial building on the corner of 27th Street.  Trial Transcript Volume III ("Trial Tr. III"): Rodrigo Garcia ("R. Garcia") at 2646:5-23; <u>Id.</u>: Matthew McKeon ("McKeon") at 2718:13-23.  The Museum of Sex (the "Museum") occupied the first three floors of the building, Studio One Networks ("Studio One") occupied the fourth floor, and Gryphon Financial Corporation ("Gryphon") occupied the fifth floor.  <u>Id.</u>: McKeon at 2719:15-18; <u>Id.</u>: Andrew Susman ("Susman") at 2808:12-14.

On the morning of May 6, 2003, Rodrigo Garcia ("Garcia") worked as the Security Director of the Museum, when he was approached separately, but in quick succession, by two black men purportedly looking for construction work.  <u>Id.</u>: R. Garcia at 2647:10-2650:2.  Security cameras captured Garcia speaking with one of the men, who wore a light-colored sweater.  <u>Id.</u> at 2657:22-2658:3.  The security tape recorded the men walking together inside the building during the day.  <u>Id.</u> at 2658:7-21.  One of the men, wearing a light-colored sweater, was recorded walking on the third, fourth, and fifth floors beginning at 1:58 a.m. the following morning, and exiting the building at 4:12 a.m.  <u>Id.</u> at 2659:23-2661:3, 2667:2-13. Declaration of Assistant Attorney General Paul B. Lyons, dated Sept. 14, 2009 ("Lyons Decl."), Ex. C.

At 6:00 a.m. on May 7, Gryphon investment banker Matthew McKeon ("McKeon") arrived at his office to find the door closed and a paper towel stuffed into the lock.  Trial Tr. III: McKeon at 2717:17-24, 2722:4-2723:17.  Upon entering the office, McKeon found a safe lying on the floor, its door unhinged and dumbbells lying next to it.  <u>Id.</u> at 2724:7-23; Trial Tr. III: Samantha Wiesner ("Wiesner") at 2737:18-2738:1, 2739:5-18; <u>Id.</u>: Andrew Jackson ("Jackson")

at 2847:11-2848:8.  Cigarette butts and a sock littered the floor.  Id.: McKeon at 2724:21-23, 2728:15-24.  The door of a second safe was unhinged and stock certificates lay scattered nearby. Id.: Wiesner at 2740:16-2741:24; Id.: Jackson at 2849:9-12.  Among the items missing were a can of Diet Coke and various electronic equipment, including MP3 and CD players.  Id.: Weisner at 2743:24-2744:10.  Two offices had been ransacked, and a window facing 27th Street, ordinarily kept closed, was open.  Id. at 2742:2-2743:21.

Someone had broken into the offices of Studio One as well.  When company president Andrew Susman ("Susman") arrived that morning, he found the office door open and clothing scattered throughout the office.  Trial Tr. III: Susman at 2811:14-24, 2812:5-2813:14.  Susman discovered a half-eaten bowl of cereal with milk, and string cheese and Power Bar wrappers littered the area.  Id. at 2814:3-18.  A watch given to him by his grandfather was stolen, and his computer had been operated.  Id. at 2718:9-2817:3, 2851-52.

In the lobby of the building, police found a plastic bag containing a white sweater.  Trial Tr. III: Sterling Tang ("Tang") at 2710:5-2711-6.  Garcia testified that the sweater resembled the sweater worn by one of the men who asked about construction work the previous day.  Id.: R. Garcia at 2659, 2704-13.  Although no doors were damaged, the windows facing the facade where the scaffolding stood were open.  Id.: Jackson at 2852:24-2853:1.  Fingerprints lifted at the scene did not match Graham's.  Trial Transcript Volume IV ("Trial Tr. IV"): Frank Vacchio ("Vacchio") at 3832:6-3833:16.

## 2.  Sims & Associates – May 7, 2003

Sims & Associates ("Sims"), a public relations company, was located on the fifth floor of 245 Fifth Avenue, a 26-story building on the corner of Fifth Avenue and 28th Street.  Trial Tr. III: Pearl Klainberg ("Klainberg") at 2672:5-2673:3.  On May 7, 2003 – the same morning the

occupants of 233 Fifth Avenue realized their offices had been burglarized – Sims learned that it, too, had been burglarized.  Id. at 2674:22-2675:10.

Upon arriving at work that morning, Pearl Klainberg ("Klainberg"), a Sims employee, noticed that the lights were on in the office, even though she was the first to arrive.  Id. at 2675:6-10.  Klainberg proceeded to the conference room, where she observed broken glass from a window accessible from the roof of the adjacent building.  Id. at 2675:18-2676:13, 2689:21-2690:12; Trial Tr. III: Jackson at 2857:9-2858:17.  As she walked through the office, Klainberg observed open cabinet and desk drawers, and papers scattered throughout the office.  Id.: Klainberg at 2675:20-2676:25, 2680:12-17.  Power Bar and string cheese wrappers were strewn on a colleague's desk and floor.  Id.: at 2679:12-2680:11; Trial Tr. III: Jackson at 2860:16-21.  In Klainberg's office, a file cabinet usually kept locked had been "jimmied open."  Trial Tr. III: Klainberg at 2677:8-2678:7, 2688:16-2689:6.  Klainberg later learned that four pre-signed, company checks had been taken from the cabinet.  Id. at 2677:14-25, 2680:25-2682:3; Trial Tr. III: Jackson at 2883:2-15.  Police found additional string cheese wrappers on the roof of the building between 233 and 245 Fifth Avenue.  Id.: Jackson at 2854:5-24.

3.   The Citibank Forgery – May 9, 2003

On May 9, 2003, Tiffany Fields ("Fields") worked as a bank teller at the Citibank branch at 717 Sixth Avenue.  Trial Tr. III: Tiffany Fields ("Fields") at 2756:6-20.  At 9:30 a.m. that morning, a black man attempted to cash a check, dated May 8, 2003, issued from the checkbook of "Sims & Associates" and made payable to "Rufus E. Graham" in the amount of $325.  Id. at 2759:19-2760:3, 2762:13-16, 2781:2-15; Trial Tr. III: Jackson at 2882:22-24.  The man presented identification in the form of a New York State public benefits card bearing his photograph and the name "Rufus Graham."  Trial Tr. III: Fields at 2760:6-25, 2778:23-2779:14;

Id.: Jackson at 2882-15-21.  Fields testified that the "man standing before [her]" was the same man depicted on the benefits card.  Id.: Fields at 2760:23-25.

Fields noticed that the check was issued "out of sequence," but that the maker's signature matched the signature on file with the bank.  Id. at 2761:16-2763:14.  Fields telephoned Sims when the man was unable to produce a second form of identification.  Id. at 2763:15-2764:18.  During the call, Klainberg informed her "that the check was a fraud."  Id. at 2763:15-2764:18; Trial Tr. III: Klainberg at 2681:17-2682:3.  Because the bank could not hold the man, however, Fields photocopied his identification card and cashed the check.  Trial Tr. III: Fields at 2764:17-2765:2, 2766:19-23, 2782:25-2783:11.

#### 4.  The Stern-Rein Residence - May 18 and May 22, 2003

Stephanie Rein ("Dr. Rein") and her husband, Edward Stern ("Stern") (together, the "Stern-Reins"), lived with their three children and nanny on the seventh and eighth floors of 291 Central Park West, an eight-story building on the corner of Central Park West and 89th Street (the "Rein-Stern residence").  Id.: Stephanie Rein ("Rein") at 2905:20-21, 2908:15-18, 2913-14.  At 11:15 p.m. on May 17, 2003, the Stern-Reins returned home from an evening out.  Id. at 2908:23-2909:2.  Upon entering the apartment, Dr. Rein placed her husband's cell phone on a desk, and the couple went to bed soon thereafter.  Id. at 2913:20-2914:10.

At approximately 10:30 a.m. the next morning, Stern realized that his wallet and cell phone were missing.  Id. at 2912:3-2913:13, 2626:17-2927:12.  Upon further investigation, he discovered that the nanny's bedroom had been ransacked.  Id. at 2914:19-2916:3, 2921:23-2922:13.  The contents of Stern's wallet were scattered throughout the bedroom, credit cards and cash missing.  Id.  Because the nanny had not spent the previous night in the apartment, the Stern-Reins thought that someone had entered the apartment.  Id. at 2909:-5-15, 2924:7-2925:7.

The burglar apparently entered from a fire escape through a window in the nanny's bedroom. Id. at 2920:14-25. Although the family had installed an alarm system, it had not yet been activated. Id. at 2927:20-24.

Four days later, on May 22, 2003, the family was asleep when the apartment alarm sounded at 4:15 a.m. Id. at 2929:5-25. The alarm indicated that the door leading to the south gallery was open. Id. at 2937:20-2938:5. The police arrived, and after canvassing the apartment determined that nothing was missing. Id. at 2932:2-17. In addition to the south gallery door being open, a child safety gate blocking access to a fire escape was open. Id. at 2935:25-2936:19; Id.: Trial Tr. III: Jessenia Guzman at 2802:25-2803:22. The police dusted the apartment for fingerprints, none of which matched Graham's. Trial Tr. IV: Vacchio at 3834:2-3835:4.

     5.   The Levin Residence – May 28, 2003

Raquel Levin ("Raquel") and her husband lived in a five-story townhouse at 16 West 88th Street. Trial Tr. III: Raquel Levin ("R. Levin") at 1892:14-22. In May 2003, the Levin residence underwent renovation, and scaffolding covered the front and rear of the house up to the roof. Id. at 1893:15-1894:1. At around 12:30 a.m. on May 28, 2003, the Levins were out of town, and their son Zachary let himself in to feed the cat and water the plants. Trial Tr. III: Zachary Levin ("Z. Levin") at 1878:4-1875:16. When Zachary left the house 45 minutes later, "[e]verything was put away and in order." Id. at 1881:10-1882:2, 1883:24-1886:2.

At approximately 6:00 p.m. the same day, Raquel returned home to find the house in disarray. Trial Tr. III: R. Levin at 1894:2-16. A banana peel lay in the waste basket in the powder room and hand towels were scattered throughout. Id. at 1895:14-1896:4. In the kitchen, Cheerios were spilled on the floor, and containers of milk, juice, and peanut butter were "all over

the place." Id. at 1896:14-26.  A half-eaten bowl of cereal with milk, several more banana peels, and loose vitamins were left on the kitchen counter.  Id. at 1896:14-26.  Raquel promptly called Zachary to confirm that he had not left the house in that condition, after which she called the police.  Id. at 1897:20-1898:8; Trial Tr. III: Z. Levin at 1887:10-1888:15.

The rest of the house was canvassed after police arrived.  Trial Tr. III: R. Levin at 1898:9-1899:3.  In the bedrooms, dresser drawers were open and various items, including clothing, were "scattered all over the place."  Id. at 1901:8-1903:12.  Among the items taken were jewelry, a coat, a purse, id. at 1934-36, a computer, and $100,000 worth of photography equipment weighing about 90 pounds.  Id.: at 1903:13-1904:8, 1905:14-1906:22; Trial Tr. III: Lear Levin ("L. Levin") at 1932:2-1934:13.  A window in a fourth floor room normally closed was open, leading to scaffolding that covered the front of the house.  Trial Tr. III: R. Levin at 1904:13-1905:5.  Latent fingerprints discovered at the scene were inconclusive.  Id.: Yolanda Williams at 1836:23-1837:12, 1847:19-1848:5.

6.  The Dwight School – June 1, 2003

The Dwight School is a private elementary school located at 18 West 89th Street.  Id.: Octavio Mercado ("Mercado") at 1952:20-1953:4.  The 89th Street campus is a four-story building on the north side of the street extending to the south side of 88th Street.  Id. at 1953:12-20; Trial Tr. III: Joseph Gelfand ("Gelfand") at 2025:17-21.  Each side of the building has a fire escape that extends from the second floor to the roof of the building.  Trial Tr. III: Gelfand at 2027:18-2028:10.  The school's windows, doors, and hallways are monitored by an alarm system.  Id. at 2030:3-8.

On the afternoon of Saturday, May 31, 2003, a school maintenance worker checked that the windows and doors were locked, and activated the alarm before leaving.  Trial Tr. III:

- 8 -

Mercado at 1955:16-1957:25. At 4:03 a.m. the following morning, the alarm was triggered by a motion detector on the third floor of the school. Id.: Philip Blair ("Blair") at 1968:2-11. At 4:12 a.m., the 88th Street door triggered a second alarm. Id. at 1968:24-1969:2. Between 5:12 a.m. and 5:48 a.m., motion detectors on the second and third floors triggered five additional alarms. Id. at 1969:9-1970:9. The security service was unable to reach school personnel whose contact information it had on file. Id. at 1968:15-1969:6.

The school alarm could be heard from outside when a custodian arrived for work on Monday, June 2. Trial Tr. III: Willy Sommerville ("Sommerville") at 1979:5-19. Inside, its office doors had been pried open, two glass door windows were smashed, and various offices were ransacked. Id.: Gelfand at 2033:18-2036:23. Food was missing from employees' desks, and a soda can and various food wrappers were found on the floor. Id. at 2051:8-12. A cellular telephone belonging to a student was stolen from a desk drawer. Id. at 2047:11-19, 2048:18-23. Police later traced two phone calls made from the student's cell phone on June 1, 2003, the day of the burglary, to a phone number matching Graham's mother. Trial Tr. III: Leah Kleiner ("Kleiner") at 2700:21-2701:23; Id.: Ray Bartkus ("Bartkus") at 2061:9-2062:17; Trial Tr. IV: Kenneth Clancy ("Clancy") at 3368:19-3369:6.

### 7.  The Cooper Residence – June 3, 2003

In June 2003, Perry Cooper ("Perry") and his wife, Jennifer (together, the "Coopers"), lived in a fourth-floor duplex apartment at 46 West 89th Street, a brownstone located between Central Park West and Columbus Avenue. Trial Tr. III: Perry Cooper ("Cooper") at 2278:22-2279:13, 2298:21-22. The second floor of the apartment consisted of a loft space on the roof level used as a home office. Id. at 2281:4-5, 2284:10-13. The roof was surrounded by a four-foot fence and was accessible from the loft by a patio. Id. at 2281:4-5, 2285:3-2286:14. The

apartment was monitored by an alarm system, with the exception of a window in the second floor bathroom. Id. at 2306:25-2307:6.

At approximately 2:00 a.m. on June 3, 2003, the Coopers were awakened by street noise, followed by a "thrashing" sound inside the apartment. Id. at 2287:3-24. Perry went up to the second floor to investigate the noise. Id. at 2288:11-2289-22. As he approached the bathroom, the door was "push[ed] shut" and locked from inside. Id. at 2290:6-11. The Coopers immediately triggered the alarm, left the apartment, and contacted police. Id. at 2290:25-2292:7.

Police broke down the door to gain entry into the bathroom, at which point it was empty and the window to the courtyard was open. Id. at 2294:17-2296:24, 2301:5-12. Twelve fingerprints were recovered from the bathroom sink, window sill, interior door, and patio door. Trial Tr. III: Thomas O'Brien ("O'Brien") at 2328:2-2330:22. Police matched, with "[o]ne hundred percent certainty," two palm prints lifted from the bathroom to Graham. Trial Tr. IV: Vacchio at 3784:6-25, 3817:9-18, 3821:22-3822:10.

8.   The Ukrainian Institute – June 3, 2003

The Ukrainian Institute is a six-story building located at 2 East 79th Street, on the corner of 79th Street and Fifth Avenue. Trial Tr. III: Anatoly Leschchenko ("A. Leschchenko") at 1531:6-8, 1534:6-13, 1535:24-1536:1. In June 2003, scaffolding covered the front of the building adjacent to the Institute. Id. at 1535:8-23, 1538:21-1539:1; Trial Tr. III: Denys Leschchenko ("D. Leschchenko") at 1580:3-10. Anatoly Leschchenko ("Anatoly") lived in an apartment on the fifth floor with his wife and son. Id.: A. Leschchenko at 1531:23-24, 1532:12-22. The second floor of the building consisted of a glass-enclosed room abutting the scaffolding. Id. at1536:2-24; Trial Tr. Vol. III: D. Leschchenko at 1580:11-1581:19. Because the apartment was not air conditioned, Anatoly usually left the second floor window open in the summer. Trial

- 10 -

Tr. Vol. III: A. Leschchenko at 1550:7-21.

At 3:45 a.m. on June 3, 2003, the Leschchenko family awoke to the sound of loud noise coming from the direction of the service stairway leading to the third floor. Id. at 1541:3-1542:21; Trial Tr. Vol. III: D. Leschchenko at 1583:8-22. Anatoly went to the stairway while his wife and son contacted police. Trial Tr. Vol. III: A. Leschchenko at 1543:10-20, 1545:2-8. At the service stairway, Anatoly opened the door and saw a strange man about to ascend the staircase. Id. at 1545:9-1546:8. Anatoly asked the man what he was doing inside the building, to which the man responded that he was sorry and left. Id. at 1547:2-8, 1548:15-23. Anatoly described the intruder as a dark-skinned, black man with a round face. Id. at 1547:2-17. From the fifth floor, Anatoly's son observed the man exit the front of the building, carrying two bags. Trial Tr. III: D. Leschchenko at 1589:2-1590:22. Police later canvassed the neighborhood with Anatoly and his son, but were unable to find the intruder. Id.: A. Leschchenko at 1563:11-1564:17.

Inside the Ukrainian Institute, a locked cabinet containing refreshments had been broken into, and a partially-eaten danish and open bottle of cranberry juice sat on the counter. Id. at 1606:4-1609:7. On the third floor, a wooden door had been kicked in, leaving a space large enough for a man to walk through. Id. at 1603:4-1604:7. The New York City Police Department's Evidence Collection Unit later arrived. Trial Tr. IV: Wilson Germosen ("Germosen") at 3734:6-11, 3738:15-16. Through latent fingerprint analysis, police matched, "[w]ith one hundred percent certainty," a fingerprint lifted from the cranberry juice bottle to Graham. Id.: Vacchio at 3781:13-3781:23; 3794:10-22.

9. The Sauthoff Residence and the Ramaz School – June 3-4, 2003

Elizabeth Sauthoff ("Sauthoff") and her husband lived at 61 East 77th Street, a residential

building between Park and Madison Avenues.  Trial Tr. III: Elizabeth Sauthoff ("Sauthoff") at 1797:17-1798:18.  The apartment occupied the rear portion of the building, and a large window in the living room opened to the roof of a section of the building.  Id. at 1799:12-1800:1.  The back of the apartment abutted the rear patio area of the Ramaz School, a private school on East 78th Street.  Id. at 1800:2-6.  Trial Tr. III: Miguel Olivo ("Olivo") at 1661:14-18; Id.: Wilfredo Garcia ("W. Garcia") at 1697:15-23.  On June 3, 2003, Sauthoff and her husband went to bed at 10:15 p.m.  Id.: Sauthoff at 1800:21-25.  Because it was a warm night, the Sauthoffs left the living room window open and unlocked.  Id. at 1801:17-25, 1807.

The following morning, Miguel Olivo ("Olivo"), building superintendent for the Ramaz School, arrived at work at 5:50 a.m. to discover that the school had been burglarized.  Trial Tr. III: Olivo at 1660:9-15, 1661:7-11, 1665:5-14.  Olivo and a school security guard canvassed the building and found that several locked doors had been forced open, offices had been ransacked, two bottles of water had been moved in the teachers' lounge, and a safe containing $3500 was missing.  Id. at 1670:20-1675:14; Trial Tr. III: W. Garcia at 1709:8-22; Id.: Angelique Loffredo ("Loffredo") at 1762:5-20.  Paper towel was jammed into the locking mechanism of an office door on the third floor.  Id.: Olivo at 1675:15-1676:22.  A second door in the same office, leading to the Sauthoff patio, was unlocked.  Id. at 1676:5-1677:22.  School officials immediately reported the burglary to police.  Trial Tr. III: W. Garcia at 1706:1-22.

At about the same time that morning, Sauthoff's husband awoke to find three rolls of quarters missing from the living room coffee table where he had left them the night before.  Id.: Sauthoff at 1802:1-1803:9.  A debit card, cash, and an MTA card were taken from Sauthoff's wallet; credit cards were strewn on the couch.  Id. at 1803:8-25, 1804:12-1805:13.  Sauthoff later learned that someone had used her debit card at an MTA vending machine at 10:50 p.m. on June

3, 2003, while the Sauthoffs slept. Id. at 1806:11-17, 1823:21-1824:3; Trial Tr. III: Charlotte Pineda ("Pineda") at 2009:16-20, 2011:7-21.

Within hours, the Ramaz School safe was discovered by police in Central Park. Trial Tr. III: W. Garcia at 1711:14-21. Someone had opened the safe and, with the exception of a few coins, emptied most of its contents. Id. at 1712:16-25. At the crime scenes, police noted the accessibility between the Ramaz School and the Sauthoff residence. Trial Tr. III: Loffredo at 1767:20-1768:4. The school's surveillance video recorded an intruder moving throughout the building at 3:30 a.m. Id.: W. Garcia at 1701:20-1702:25, 1714:11-1715:10, 1725:11-1726:25.

### 10. The Levine Residence – June 6, 2003

Terry Levine ("Terry") and her husband Carl lived with their daughter, Janna, on the second floor of 19 East 95th Street, a six-story townhouse. Id.: Terry Levine ("T. Levine") at 2072:7-2074:5. At 4:30 a.m. on June 6, 2003, Terry awoke to the sound of the floor creaking outside the couple's bedroom; she called her daughter's name thinking it was Janna walking down the hall. Id. at 2079:8-2080:20, 2083:15-2084:1. When she heard no response, Terry walked to Janna's room and opened the door to find a man standing there. Id. at 2080:21-2081:10, 2084:2-10. Terry screamed, at which point the man quickly darted past her, out of the bedroom. Id. at 2081:11-15, 2082:1-20, 2086:4-7, 2087:17-2088:1; Trial Tr. III: Janna Levine ("J. Levine") at 2176:10-22. Terry noticed that the man was black and slender, with an athletic build. Id.: T. Levine at 2085:9-25. The man ran past Carl, who awoke in the midst of the commotion, and jumped out of an open window in the living room. Id. at 2082:14-2083:2.

Terry and Janna later canvassed the neighborhood with police, but were unable to find the intruder. Id. at T. Levine at 2108:15-23, Trial Tr. III: J. Levine at 2186:2-2187:4. At the police precinct later that morning, the family viewed a photographic array of potential suspects,

but was unable to make an identification. Id.: T. Levine at 2105:20-12, 2106:13-23, 2107:13-15; Id.: J. Levine at 2187:5-2188:6. Nothing was missing or damaged from the Levine residence. Id.: T. Levin at 2092:25-2093:1; Id.: J. Levine at 2181:18-23.

On June 10, 2003, detectives showed Terry and Janna a second photographic array. Id.: T. Levine at 2108:22-2109:5, 2110:7-13; Id.: J. Levine at 2189:3-9. Both selected a picture of suspect Milton Greg. Id.: J. Levine at 2190:13-2191:1; Id.: Thomas Hovagim ("Hovagim") at 2232:4-25. The women also helped police compose a sketch, but after two hours neither found that it matched the intruder, and gave up. Id.: T. Levine at 2112:6-2113:24, 2125:7-11; Id.: J. Levine at 2192:14-2194:10.

11. The Sutel Residence – June 7, 2003

Seth Sutel ("Sutel") lived alone on the third floor of 214 Riverside Drive, an apartment building on the southwest corner of West 94th Street. Trial Tr. IV: Seth Sutel ("Sutel") at 3031:1-3032:18. At 12:30 a.m. on June 7, 2003, Sutel returned home to find a strange man standing in his living room, wearing his clothes. Id. at 3033:9-24, 3035:9-22. The man was carrying Sutel's digital camera, computer case, and canvas suitcase. Id. at 3035:23-3036:2. The stranger told Sutel not to move, or a man in the next room would shoot him. Id. at 3036:3-3037:9. After a brief exchange, the man escaped into the bedroom, leaving behind Sutel's canvas bag. Id. at 3037:10-26, 3046:5-18. Sutel left the apartment and asked a neighbor to contact police. Id. at 3038:2-5. He later described the intruder as a dark-skinned black man in his late 30's, with an athletic build and large eyes. Id. at 3039:5-9, 3045:14-25.

After police arrived, Sutel reviewed the rest of the apartment. Id. at 3047:7-10. Several items were missing, and two windows accessible from a fire escape had been opened. Id. at 3048:8-25, 3049:1-23, 3054:13-3056:10, 3061:23-3062:22, 3063:3-10.

- 14 -

Over the next two days, police showed Sutel hundreds of photographs and several photo arrays. Id at 3065:22-3066:22. Sutel identified Milton Greg – the same suspect initially identified by Janna and Terry Levine. Id. at 3067:5-23; Trial Tr. IV: Brian Booth ("Booth") at 3135:16-3130:25; Trial Tr. III: J. Levine at 2190:13-2191:1; Id.: Hovagim at 2232:4-25. Sutel thought the man looked "somewhat familiar," but rated his confidence in his identification a "four or five" on a scale of one to ten. Trial Tr. IV: Sutel at 3067:5-23; Id.: Booth at 3131:13-3132:12. Sutel also helped police create a sketch of the burglar. Id. at 3067:24-3068:4. With the exception of the eyes, which Sutel thought were too far apart, the sketch accurately reflected the burglar. Id. at 3068:14-3069:13. A right thumb print lifted from the desktop in the bedroom matched Graham's fingerprint. Trial Tr. IV: Vecchio: 3782:1-22, 3823:1-3824:20; Id.: Erica Dangerfield ("Dangerfield") at 3195:20-3196:7, 3205:24-3206:6, 3224:21-3225:23.

12. The Mossavar-Rahmani Residence – June 7, 2003

The Mossavar-Rahmani family lived on the first floor of 953 Fifth Avenue, a 15-story residential building between 76th and 77th Streets. Trial Tr. Vol. III: Jimmy Mero ("Mero") at 2374:23-2375:9, 2376:5-10; Id.: Bijan Mossavar-Rahmani ("Mossavar-Rahmani") at 2405:12-2407:3, 2410:17-23. The building was monitored by a silent alarm system. Id.: Mero at 2378:13-20. A glass greenhouse occupied the rear portion of the first floor of the apartment, which in turn abutted a fenced-in patio. Id. at 2409:7-20, 2411:1-22. In June 2003, scaffolding covered an adjacent building undergoing construction. Id. at 2412:8-24; Id.: Mero at 2377:15-17.

On June 7, 2003, the Mossavar-Rahmani family was overseas. Id.: Mossavar-Rahmani at 2413:7-16. At approximately 1:30 a.m., the alarm system was triggered, and the doorman went to the rear yard to investigate. Id.: Mero at 2379:8-15. Although the doorman saw no suspicious activity, he noticed that the air conditioner in the Mossavar-Rahmani apartment had been turned

on. Id. at 2379:16-2380:5.  The doorman reactivated the alarm.  Id. at 2379:20-22.

The next morning, the building alarm again was triggered.  Trial Tr. III: Felix Garcia ("F. Garcia).  After briefly inspecting the premises, the elevatorman noticed that the front door to the Mossavar-Rahmani apartment was open, and that the apartment had been burglarized.  Id. at 2390:21-2395:7-8.  A safe stored on the second floor of the apartment was damaged.  Id.: Mossavar-Rahmani at 2418:10-2419:6; Id.: Larick at 2502:22.  A wooden trellis mounted along the adjacent building, but touching the apartment's terrace, was damaged.  Id.: Mossavar-Rahmani at 2420:8-25.  Clothing that did not belong to the Mossavar-Rahmanis was found in their master bedroom, and several personal items, including clothes and a cellular phone, were stolen.  Id. at 2421:1-2424:15, 2430:10-21.  A partially-eaten apple and a half-eaten bowl of cereal were left on the kitchen counter.  Id.: Larick at 2501:28-29.  In the greenhouse, a glass panel was broken.  Id.: Mossavar-Rahmani at 2417:18-23.

Police surmised that the intruder entered the apartment by climbing the scaffolding of the adjacent building, jumping down into the courtyard of 953 Fifth Avenue, and climbing the fence surrounding the patio into the greenhouse.  Id.: Larick at 2501:20-2508:21.  Police later matched phone calls made from the stolen cellular phone to Graham's mother.  Id. at 2433:18-2434:24.

### 13. The Bookings Group – June 11, 2003

The Bookings Group occupied the seventh floor of 145 West 45th Street, a twelve-story office building.  Trial Tr. II: Matthew Barnaba at 1113:22-23, 1115:3-9.  At 1:00 a.m. on June 11, 2003, the alarm was tripped by shattered glass and, thereafter, by movement.  Id. at 1124:18-1126-14.  When business manager Matthew Barnaba ("Barnaba") arrived at the office soon afterward, he was greeted in front of the building by uniformed police officers and a guard from the alarm company.  Id. at 1127:5-12.  Inside, the entry door to the seventh floor office was

shattered, and the police officers directed the others to remain in the hallway while they canvassed the floor. Id. at 1127:13-1129:22. Moments later, Barnaba heard "scuffling and yelling" from inside the offices, after which the officers "came running back out to the hallway" and asked Barnaba how they could get to the back of the building. Id. at 1129:23-1130:12

Barnaba and the guard later discovered that several offices had been ransacked. Id. at 1132:20-1133:4. The intruder left behind a backpack containing, among other things, a wallet with Graham's social security card and New York State public benefits card, and electronic devices taken from the office. Id. at 1132:6-20, 1134:16-1136:20; Trial Tr. II: Raymond Gogarty ("Gogarty") at 1205:24-1207:8.

### B. Arrest and Identification

Officers Raymond Gogarty ("Gogarty") and Matthew Yasinsky ("Yasinsky") of the Midtown North Precinct patrolled the neighborhood during the early morning hours of June 11, 2003. Trial Tr. II: Gogarty at 1162:20-1164:25; Id.: Matthew Yasinsky ("Yasinsky") at 1379:21-1380:17. Between 1:30 and 1:45 a.m. that morning, the officers responded to a radio transmittal that a commercial alarm was triggered at 145 West 45th Street. Id.: Gogarty at 1165:9-24; Id.: Yasinsky at 1381:19-1382:2. The officers immediately drove to the location, where they were greeted by Barnaba and the security guard, who directed police to the seventh floor. Id.: Gogarty at 1165:25-1167:13.

Gogarty and Yasinsky searched the premises when they heard a loud noise coming from the other side of the floor. Id. at 1168:15-1169:19; Trial Tr. II: Yasinsky at 1383:12-1384:5. The officers found Graham sitting on the sill of an open window in the conference room, facing outward. Id.: Gogarty at 1169:1-1172:20; Id.: Yasinsky at 1384:6-25. For 30 seconds the officers tried to convince Graham to surrender, but instead he jumped to the roof of an adjacent

- 17 -

building 30 feet below and ten feet away. Id.: Gogarty at 1172:20-1173:1, 1176:11-23, 1177:17-1178:14; Id.: Yasinsky at 1385:12-1386:10, 1387:5-1388:1.  Despite limping and telling police that he "hurt [his] leg," Graham ran across the rooftop and disappeared down a fire escape. Id.: Gogarty at 1178:4-1181:5; Id.: Yasinsky at 1388:2-7.

As the officers transmitted Graham's description to other police in the area, they descended the building staircase and ran out to the street, where they were joined by other police from neighboring precincts. Id.: Gogarty at 1182:1-1183:20; Id.: Yasinsky at 1388:8-25; Id.: Christopher Gahn ("Gahn") at 1305:13-1306:11.  On the street, police saw Graham emerge from a door and run westbound on 46th Street. Id.: Gahn at 1308:12-1309:20.  Gogarty pursued Graham in a westbound direction for about two blocks, after which he lost sight of him. Id.: Gogarty at 1183:21-1185:2; Id.: Gahn at 1310:19-1311:2.  Nonetheless, Gogarty continued to run in that direction. Id.: Gogarty at 1185:3-23.

When Gogarty arrived at 46th Street between Broadway and Eighth Avenue, officers from the Midtown South Precinct stood outside a vacant church undergoing construction. Id. at 1186:12-9, 1187:21-23, 1189:22-25.  Graham had scaled a seven-foot high fence covered with barbed wire and run into the church. Id. at 1187:9-20, 1190:1-3; Trial Tr. II: Gahn at 1313:24-1314:25; Id.: Derrick Tricoli ("Tricoli") at 1371:3-8, 1372:25-1373:8.  Emergency services eventually arrived, cut open the fence, and apprehended Graham in a crawl space inside the church. Id.: Gogarty at 1189:15-1190:20; Id.: Gahn at 1315:14-19, 1316:1316:12-1318:8; Id.: Thomas Hourican ("Hourican") at 1471:22-1474:11.

Upon his arrest, Graham was taken to Bellevue Hospital. Id.: Gahn at 1318:9-22; Id.: Yasinsky at 1394:7-1395:6.  The treating physician testified that Graham did not have injuries – such as bruising, abrasions, broken bones, or any other injuries consistent with a steep fall.  Trial

Tr. III: William Goldberg at 3720:4-23.  Graham was released from the hospital at approximately

4:45 a.m, id. at 3719:20-24, and arrived at the Midtown North Precinct at around 5:00 a.m.  Trial

Tr. II: Gogarty at 1208:14-1209:1.

Later that day, Detective Angelique Loffredo ("Loffredo"), who investigated the Ramaz

School burglary, was notified that a suspect in the so-called "Spiderman" burglaries was at the

Midtown North Precinct.  Trial Tr. II: Loffredo at 1777:11-1778:7.  Upon arriving at the

precinct, Loffredo noticed that Graham's clothing matched the clothing worn by the perpetrator

during the Ramaz School burglary.  Id. at 1770:10-1771:10.  Officer Larick vouchered Graham's

clothing, which included ripped sweatpants with a white stripe.  Id. at 1773:19-1775:6; Trial Tr.

III: Hovagim at 2253:24-2254:20; Id.: Hackett 2483:15-2484:20.

The following day, June 12, Graham participated in a police-arranged line-up at the 24th

Precinct.  Janna Levine was unable to make an identification, while Terry Levine thought she

recognized Graham, but "wasn't 100 percent sure." Id.: J. Levine at 2197:7-20; Id.: T. Levin at

2117:6-2120:22.  When she got home that evening, however, Terry suddenly recalled that

Graham was the intruder, and immediately informed the police.  Id.: T. Levine at 2122:5-

2122:17-25.  At trial, Terry stated that Graham looked "similar" to the burglar, but that she was

not sure.  Id. at 2090:3-6.  At trial, and at the line-up, Sutel identified Graham as the individual

who had burglarized his home.  Trial Tr. IV: Sutel at 3074:8-21, 3041:4-10.

### C.  Pre-Trial Suppression Hearing

Graham moved to suppress ten written statements he made to police after his arrest,

including written confessions to 13 of the 23 counts on which he had been charged.  Appendix

Accompanying Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus ("Appx."), at A3-

A13.  On July 13, 2004, the trial court held a consolidated hearing to determine, inter alia, the

- 19 -

admissibility of the statements, at which the following facts were adduced:

After his release from Bellevue Hospital, Graham arrived at the Midtown North Precinct between 5:00 and 5:15 a.m. on June 11, 2003. Trial Transcript Volume I (Pretrial Hearing) ("Trial Tr. I ("Hearing")): Gogarty at 409:3-5, 411:13-18. Between 5:15 and 7:00 a.m., Detective Gogarty processed Graham's arrest and placed him in a holding cell, while police waited for the precinct's one interview room to become available. Id. at 411:19-25, 412:1-6, 417:10-19, 422:18-22, 441:19-21. At 7:00 a.m., Graham was given food and drinks, and he was permitted to use the bathroom. Id. at 413:23-414:10. At certain points, Gogarty observed Graham laying down or sitting on a bench in the holding cell. Id. at 412:7-14, 413:13-22.

At approximately 11:00 a.m., Gogarty escorted Graham to a different holding cell in the precinct's detective squad unit. Id. at 413:6-12, 415:2-4, 419:25-420:4. While police waited for the interview room to become available, Graham was provided with cigarettes and drinks. Id. at 416:3-9. He eventually fell asleep on a bench in the holding cell. Trial Tr. I ("Hearing"): Clancy at 133:3-11. Gogarty testified that at least one detective may have spoken to Graham while he was held in the detective squad cell. Id.: Gogarty at 420:3-422:5.

At 11:30 a.m. the same morning, Detective Kenneth Clancy ("Clancy") of the 24th Precinct arrived at the Midtown North Precinct. Id.: Clancy at 131:7-15; Id.: Gogarty at 413:1-5. Clancy had been informed that a burglar fitting the so-called Spiderman's profile had been arrested earlier that morning. Id.: Clancy at 129:21-130:13, 211:25-212:6. No previous arrests had been made in connection with the string of burglaries. Id. at 129:10-12.

By 1:00 p.m., Clancy decided to interview Graham in an unoccupied sergeant's office because the interview room was occupied; he and another detective escorted Graham into the

office and cuffed one of his hands to a chair.[1]  Id. at 132:10-133:23, 134:11-24, 135:14-17.  The detectives spoke with Graham at length about sports and exercise, in an effort first to make him feel comfortable.  Id. at 135:18-136:23, 205:15-206:4, 217:22-218:2.  After one hour, Graham "sat back in his chair, looked at both of [the detectives] and said 'I know what you guys want . . . You want to know about spiderman.'"  Id. at 136:23-137:7.  Clancy then administered Miranda warnings from a pre-printed form.  Id. at 137:8-138:21, 204:16-22.  Graham responded that he understood each warning, and Clancy marked the form accordingly.  Id. at 139:8-140:140:5.  When asked whether he was willing to answer questions, Graham responded affirmatively and signed the Miranda form.  Id. at 140:6-12.

Clancy began by asking Graham what he knew about the Spiderman burglaries, to which Graham responded that he thought the crimes were committed by a group of Latino drug dealers. Id. at 141:15-142:4, 242:7-20.  Over the next three hours, Clancy and Monahan entered and exited the interview room several times to discuss how best to proceed.  Id. at 143:17-144:2, 148:7-17.  Graham was given breaks to go to the bathroom and drink water, and the detectives provided him with food.  Id. at 143:17-24, 149:20-150:9, 187:9-12.  The detectives moved Graham to the interview room when it became available.  Id. at 146:7-12, 229, 232-34.  Graham never asked for an attorney or requested that the interview end.  Id. at 145:13-16.  At 5:00 p.m., he wrote a statement denying any involvement in the burglaries.  Id. at 141:21-143:16; Appx. at A1-A2.

Despite the exculpatory statement, the detectives believed Graham was involved, and

---

[1] Officer Gogarty offered conflicting testimony with respect to the start of the interview. Gogarty testified that Graham was placed in an interview room at 11:00 a.m. – thus suggesting he spent a short time in the detective squad holding cell – and that unnamed detectives began to interview Graham at that point.  Id.: Gogarty at 442:6-13.  However, Justice Yates credited the testimony of Detective Clancy on this point.  Id.: Colloquy at 518:22-519:4.

decided to confront him with incriminating evidence. Id. at 222:2-13. For example, police matched a phone number dialed from the cellular phone stolen during the Dwight School burglary to the number Graham provided for his mother on the pedigree sheet when he was arrested. Id. at 147:16-149:19. Graham explained the call by claiming that he purchased the telephone "from a crack head on the street." Id. at 151:9-14. When police told him that his fingerprints matched fingerprints lifted from a burglarized apartment, Graham responded that "from time to time" he would "meet men on the street and go up to their apartment with them." Id. at 152:24-154:11. Graham did not ask that the questioning cease, nor did he request the presence of an attorney. Id. at 155:14-23.

At 10:15 p.m., Detective Hackett waited at the Midtown North Precinct for Clancy to conclude his interview of Graham. Trial Tr. I (Hearing): Hackett at 57:16-25; 59:2-12, 107:4-11. As Clancy exited the interview room, he advised Hackett that he had administered Miranda warnings, and showed Hackett a copy of the warnings bearing Graham's signature. Id. at 60:3-61:15, 111:6-15; Trial Tr. I (Hearing): Clancy at 156:23-157:3. According to Hackett, Clancy also told him that Graham had denied any involvement in the burglaries, and that "he did not want to talk." Id.: Hackett at 57-60, 107:18-22, 111:16-20. Clancy testified that he told Hackett that he believed Graham was "the right guy," but that he was "giving [the detective] bits and pieces without beings [sp] 100 per cent truthful," and that Graham "waived his Miranda." Id.: Clancy at 156:8-157:3.

At 10:40 p.m., Hackett and two other detectives entered the interview room. Id.: Hackett at 63:4-10. The men sat across from Graham, who still had one wrist cuffed to his chair. Id. at 62:14-63:3, 108:20-22. Hackett began the interview by telling Graham that he "wanted to speak to him about some burglaries on the east side of Manhattan." Id. at 63:14-18. Graham initially

- 22 -

denied knowing anything about the crimes, and told the detectives that he "refused to speak about the burglaries." Id. at 63:19-23; 86:6-86:24.

Hackett then told Graham that police had obtained fingerprints, videos, and witnesses in connection with those burglaries, but did not tell Graham whether the evidence was traced to him. Id. at 63:23-64:1. Graham responded that police should "just charge [him] with everything, I did everything." Id. at 64:1-2. Hackett told Graham that he had to ask him about each burglary, and began to do so. Id. at 64:3-7. Graham again denied knowledge of the burglaries, but also told police to "just charge him with everything." Id. at 64:15-19, 67:12-14. At that point, Hackett and the two detectives began to exit the interview room, when Graham said that he wanted to speak to Hackett alone. Id. at 68:2-10, 114:25-115:6. Nonetheless, the men exited the room. Id. at 68:11-17, 115:7-8. Hackett returned alone a few minutes later, after which Graham told him that "he wanted to talk about the burglaries" and "get it over with." Id. at 68:20-24.

Hackett questioned Graham about the individual crimes, beginning with the burglary of the Levine residence, to which Graham confessed. Id. at 69:15-20; Appx. at A8-A10. Hackett transcribed the statement, but from then on Graham wrote his own statements, directing Hackett to "[j]ust tell me a location and I'll tell you what I did." Trial Tr. I (Hearing): Hackett at 72:3, 75:6-10, 116:3-17. Between 11:40 pm. and 12:25 a.m., Graham wrote and signed confessions to four additional burglaries: the Mossavar-Rahmani residence, id. at 74:23-76:2 & Appx. at A11, the Ramaz School, id. at 77:21-80:7 & A12, the Sauthoff residence, id., and the Ukrainian Institute, id. at 81:3-18 & A13. Hackett did not testify that he administered Miranda warnings a second time.

At 12:30 a.m., Hackett walked Graham to the bathroom. Trial Tr. I (Hearing): Clancy at

- 23 -

157:13-158:9. As he passed Clancy, Graham pointed into the interview room and told Clancy that he was "up next." Id. 157:13-158:9,172:15-173:1, 275:20-276:3; Trial Tr. I (Hearing): Hackett at 113:19-24.  Soon thereafter, Clancy entered the interview room and questioned Graham about the burglaries committed in the jurisdiction of the 24th Precinct.  Trial Tr. I (Hearing): Clancy at 159:16-160:6.

Between 12:35 a.m. and 2:40 a.m., Graham confessed, orally and in writing, to the burglaries at the Stern-Rein residence, id. at 161:10-168:15, 169:7-170:17 & Appx. at A3-A4, the Levin residence, id. at 173:2-178:9 & Appx. at A5, the Dwight School, 180:23-183:21 & Appx. at A6, and the Sutel residence, id. at 178:22-179:21, 184:1-187:1 & Appx. at A7.  Graham did not ask that the interview cease, nor did he ask for an attorney.  Id. at 188:19-25.  Clancy testified on cross-examination that he did not administer Miranda warnings a second time.  Id. at 204:23-205:5.  After 14 hours of questioning by police, Graham had confessed to committing 13 crimes.

The trial court denied Graham's motion to suppress the written statements.  Justice Yates explained that Graham's statement to Hackett "that he didn't want to answer questions about individual burglaries," and to "just charge him with all of them" was not "a clear indication to the officers that [he] was rescinding his previous [Miranda] waiver or that he was invoking a right to cut off questioning."  Trial Tr. I: Decision at 532:12-19.  The court further found that the detectives "cease[d] interrogation by getting up to leave," and by refusing to entertain a summary confession of the crimes.  Id. at 533:16-20.  Thus, Graham "knowingly and voluntarily waived his rights under Miranda and . . . [police] did not continue interrogation except upon the defendant's invitation."  Id. at 234:9-17.

### D. The Trial

On July 27, 2003, Graham was tried on nine counts of second-degree burglary, seven counts of third-degree burglary, five counts of fourth-degree grand larceny, and one count each of second-degree forgery and second-degree possession of a forged instrument.  The testimony at trial with respect to Graham's confessions did not differ materially from the testimony presented at the pre-trial hearing.  See, supra, § II(C).  Graham's written statements were entered into evidence and presented to the jury, over defense counsel's objections.  Appx. A1-A13 (marked as exhibits).

Notably, police testified that by June 10, 2003, two precinct-wide patterns had morphed into a borough-wide pattern.  Trial Tr. IV: Hackett at 3407:16-22; Id.: Clancy at 3328:2-25.  Specifically, the 19th Precinct noticed that the burglaries at the Ukrainian Institute, the Sauthoff residence, and the Ramaz School occurred at night, and that the perpetrator entered the premises by climbing into windows.  Trial Tr. IV: Hackett at 3404:16-3407:15.  The 24th Precinct noticed that the burglaries at the Dwight School, the Cooper residence, the Levin residence, the Stern-Rein residence, and the Sutel residence took place "during the night," that entry was accomplished by means of "window or fire escape or patrio [sic], . . . [when] the residents were at home," and "most occurred either on 88[th] Street or 89th Street."  Id.: Clancy at 3312:7-3313:3315:10, 3320:19-3321:16, 3326:22-3328:1.

### E. The Verdict

On August 23, 2004, after three days of deliberation, the jury convicted Graham of six counts of second-degree burglary, six counts of third-degree burglary, and one count each of second-degree forgery, second-degree criminal possession of a forged instrument, and fourth-degree grand larceny.  Trial Tr. IV: Verdict at 4434:6-4437:10; Declaration of Paul B. Lyons

Supporting Respondent's Opposition to the Petition for a Writ of Habeas Corpus, dated Sept. 14, 2009 ("Lyons Decl.") at Ex. A (Doc. No. 11).  Specifically, Graham was convicted of the burglaries committed at 233 Fifth Avenue, the Levin residence, the Cooper residence, the Sutel residence, the Mossavar-Rahmani residence, the Dwight School, the Ukrainian Institute, the Ramaz School, and the Bookings Group; grand larceny and burglary at the Sauthoff residence; and the forgeries at Citibank.  Id.  Graham was acquitted of the burglaries at Sims & Associates and the Levine residence, and burglary and grand larceny at the Stern-Rein residence.  Id.

### F.  Sentencing

The prosecution sought to have Graham sentenced as a persistent felony offender pursuant to New York Penal Law (N.Y.P.L.) § 70.10, which permits a court to sentence a defendant who has committed at least two prior felonies to an enhanced prison term.  Appx. at A14; N.Y. Penal Law § 70.10(1)(a).  At an evidentiary hearing held on April 1, 2005, Justice Yates found "beyond a reasonable doubt that [Graham] is a persistent felony offender," and scheduled a second hearing to determine the proper sentencing range.  Appx. at A41:24-A42:2, 47:15-16 & A49 (Order dated April 1, 2005).  Justice Yates noted that adjudication as a persistent felony offender would not necessarily result in a sentencing enhancement, but that Graham merely was "eligible for such consideration."  Id. at A42:2-5.

On June 24, 2005, the court held a second hearing.  After hearing from both sides, the court determined that an enhanced sentence was appropriate, and sentenced Graham to 13 concurrent, indeterminate terms of 25 years to life imprisonment.  Id. at A82:20-22.  The court emphasized that the sentencing range was based solely on the "15 crimes for which the jury rendered a verdict of guilty and the . . . 4 previous convictions," and that "no factual determination beyond that" was made.  Id. at A82:2-9.

### G. State Collateral Appeal

On January 3, 2006, Graham moved to set aside the judgment of conviction pursuant to Criminal Procedure Law (CPL) § 440.10, arguing that the prosecution had failed to turn over a written statement regarding the Bookings Group burglary.  Appx. at A119 (Decision and Order dated May 8, 2006).  After conducting a hearing, the court denied the motion, finding that the prosecution likely produced the statement with its Rosario disclosures and, in any event, the statement was not material because it would not have altered the outcome of the trial.  Id. at A121.

In addition to appealing the denial of his CPL § 440.10 motion, Graham directly appealed his conviction to the New York State Supreme Court, Appellate Division, First Department (the "Appellate Division").  Graham raised four arguments on appeal: (1) the length of time he was questioned by police and the failure to re-administer Miranda warnings rendered his statements to them involuntary; (2) the prosecution failed to produce Graham's written statement regarding the Bookings Group burglary or, in the alternative, his trial attorney was ineffective for losing the statement or failing to demand its production; (3) certain counts of the indictment should have been severed; and (4) N.Y.P.L. § 710.10 violates Apprendi v. New Jersey, 530 U.S. 466 (2000), because it requires that the trial judge make additional findings of fact, in violation of the Sixth and Fourteenth Amendments.  Appx. at A122 (Brief for Defendant-Appellant, filed March 13, 2007).  The Appellate Division consolidated the collateral and direct appeals, and rendered a decision on February 14, 2008.  People v. Graham, 48 A.D.3d 265, 856 N.Y.S.2d 7 (1st Dep't 2008).

First, the Appellate Division unanimously agreed with Graham that the trial court had erred in failing to suppress his statements to police.  Specifically, the court found that

> [a]fter receiving <u>Miranda</u> warnings from one detective, [Graham] told another
> detective about eight hours later that he did not want to talk about any of the
> burglaries at issue.  At this point, the police should have ceased interrogation
> (see <u>People v. Ferro</u>, 63 N.Y.2d 316, 322 [1984], <u>cert denied</u> 472 US 1007
> [1985]; <u>People v. Brown</u>, 266 A.D.2d 838 [1999], <u>lv denied</u> 94 N.Y.2d 860
> [1999]).  Instead, the second detective immediately, and without new warnings,
> told [Graham] that there was video and fingerprint evidence linking him to the
> crimes; this led [Graham] to say, "charge me with everything, I did everything."
> The police comment clearly constituted interrogation and was improper (<u>see</u>
> <u>People v. Kollar</u>, 305 A.D.2d 295, 298 [2003], <u>appeal dismissed</u>, 1 N.Y.3d 591
> [2004]).  Although [Graham] later asked to speak to the detective and made the
> confessions that were admitted at trial, the detective never readministered
> <u>Miranda</u> warnings.

<u>Id.</u> at 266.  Nonetheless, the court found the error harmless as to all counts, except for the

burglary and grand larceny convictions relating to the Sauthoff residence, to which Graham was

entitled to a new trial.  <u>Id.</u> at 266-67.  "[T]he other crimes," the court found, were "established by

fingerprints or other compelling evidence, and there [was] no reasonable probability that the

confession contributed to the verdict."  <u>Id.</u> at 267.

Second, the Appellate Division found that Graham "established by a preponderance of

the evidence" that the prosecution failed to turn over his statement to police regarding the

Bookings Group burglary, and concluded that Graham was prejudiced because he could have

used the statement for impeachment purposes.  <u>Id.</u> at 266-67.  The court again found harmless

error, however, and held that Graham was "not entitled to any remedy . . . beyond the remedy . . .

granted . . . with respect to his direct appeal."  <u>Id.</u>

Third, the Appellate Division held that the trial court "properly exercised its discretion"

in adjudicating Graham a persistent felony offender.  <u>Id.</u> at 267.  The trial court's sentencing

procedure was based "entirely on the constitutionally permissible factors of the instant jury's

findings, defendant's prior convictions, and the court's discretionary evaluation of the

seriousness of defendant's criminal history."  <u>Id.</u> (internal citations omitted).  Finally, the

Appellate Division rejected Graham's severance claim as "unpreserved" and, in the alternative,

rejected the claim "on the merits." Id.

In letters dated February 28, 2008 and March 17, 2008, Graham sought leave to appeal to the Court of Appeals. A324 (Letter of Abigail Everett to Hon. Judith Kaye, dated Feb. 28, 2008), A326 (Leave to Appeal Letter). Graham argued that the trial court's error in failing to suppress his statements was not harmless, and that a new trial was warranted with respect to the 13 remaining convictions. Id. The March 17 letter referred the Court of Appeals "to the Appellate Division briefs for discussion of additional issues," and specifically cited Graham's argument challenging his adjudication as a persistent felony offender. A333 at note 8. The Court of Appeals denied leave on July 11, 2008, finding no "question of law . . . which ought to be reviewed." People v. Graham, 10 N.Y.3d 959, 863 N.Y.S.2d 143 (2008).

### H. The Instant Petition

Having exhausted all of his claims, Graham, represented by counsel, timely filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 on May 15, 2009. The Petition raises the same claims made on direct appeal — that (1) his statements to police were procured in violation of Miranda, and their admission at trial was not harmless; (2) in the alternative, the Court should hold a hearing permitting Graham to develop facts relevant to his claim that the confessions were involuntarily procured; and (3) his adjudication and sentencing as a persistent felony offender violate Apprendi and its progeny.[2]

## III.  DISCUSSION

### A.  Confessions Claim

The Appellate Division determined that the trial court's denial of the motion to suppress Graham's written confessions was harmless error because the other evidence presented by the

---

[2] Graham is not pursuing his severance claim in this Petition. Pet'r Mem. at 71, n.30.

prosecution was sufficient to convict him.  Graham, 48 A.D.3d at 266-67.  Graham argues that

the admission of his statements was not harmless because it resulted in his conviction of crimes

to which he did not confess, and the crimes to which he did confess were not supported by other

evidence.  Pet'r Mem. of Law at 77-91.

       1.  Standard of Review

     "Where a state appellate court has found that a state trial court committed a constitutional

violation but has held that the violation was harmless, the standard of review for a federal court

conducting habeas corpus review has not yet been clearly established."  Perkins v. Herbert, 596

F.3d 161, 175 (2d Cir. 2010).  In Perkins, the Second Circuit identified two tests for reviewing a

state court's determination that a constitutional violation was harmless.  Id.  Under the first test, a

federal habeas court must determine "whether the constitutional error resulted in 'actual

prejudice' to the defendant."  Id. at 175 (quoting Brecht v. Abrahamson, 507 U.S. 619, 631

(1993)).  The Brecht test requires that habeas relief be denied "unless, 'in light of the record as a

whole, [the constitutional violation] had substantial and injurious effect or influence in securing

the defendant's conviction.'"  Perkins, 596 F.23d at 175 (quoting Brecht, 507 U.S. at 638).

     The second test is derived from Chapman v. California, 386 U.S. 18 (1967).  Perkins,

596 F.3d at 175.  In Chapman, the Supreme Court found that "before a federal constitutional

error can be held harmless, the court must be able to declare a belief that it was harmless beyond

a reasonable doubt."  Chapman, 386 U.S. at 24.  An error is harmless if it "did not contribute to

the verdict obtained."  Id.  Subsequent to Chapman, Congress passed the Antiterrorism and

Effective Death Penalty Act of 1996 (the "AEDPA"), 28 U.S.C. § 2254(d).  Perkins, 596 F.3d at

175.  The AEDPA provides, in part, that a writ of habeas corpus may not be granted unless the

state court decision "was contrary to, or involved an unreasonable application of, clearly

established Federal law." Id. (quoting 28 U.S.C. § 2254(d)(1)).  The Supreme Court later incorporated the "unreasonable application" language into the Chapman standard and held that habeas relief may not be granted "if the state court simply erred in concluding that the State's errors were harmless . . . rather, habeas relief is appropriate only if the [state appellate court] applied harmless-error review in an 'objectively unreasonable' manner.'" Perkins, 596 F.3d at 175-76 (quoting Mitchell v. Esparza, 540 U.S. 12, 18 (2003)).

Both Petitioner and Respondent cite the Brecht test as the proper standard of review.[3] Pet'r Mem. of Law at 72; Resp. Mem. of Law at 33.  But the Second Circuit has declined to decide which of the two tests – Brecht or Chapman – governs, and instead has applied both standards.  See, e.g., Perkins, 596 F.3d at 176 ("We need not decide whether both tests apply in such a scenario, or whether Brecht applies by itself."); Howard v. Walker, 406 F.3d 114, 123 (2d Cir. 2005) ("Where the question has arisen [regarding the Chapman and Brecht standards of review], this court has declined to resolve it, finding instead that the harmlessness determination would be identical under either analysis"); Benn v. Greiner, 402 F.3d 100, 105 (2d Cir. 2005) (referring to the "open question" of whether Chapman or Brecht applies, and declining to resolve the issue because both "produce the same result in this case"); Brown v. Keane, 355 F.3d 82, 91 (2d Cir. 2004) (noting "open question" of whether, after AEDPA, Brecht or Chapman applies).  Accordingly, this Court must decide whether the Miranda violation had a "substantial and injurious effect," Brecht, 507 U.S. at 637, and whether the Appellate Division reasonably determined that the violation was harmless.  Mitchell, 540 U.S. at 17-19.[4]

---

[3] Perkins was decided after the briefs in this case were submitted.

[4] At least one district judge in this Circuit believes that there is no "open question" on this issue, and that the Supreme Court in Frye v. Pliler, 551 U.S. 112, 121-22 (2007), appears to have held that the Brecht standard applied in federal habeas proceedings in which state court harmless

## 2.  Admission of the Statements Was Harmless Error

In determining whether an improperly admitted confession was harmless error, a court must evaluate four factors: "(1) the overall strength of the prosecution's case; (2) the prosecutor's conduct with respect to the improperly admitted evidence; (3) the importance of the wrongly admitted testimony; and (4) whether such evidence was cumulative of other properly admitted evidence." Zappulla v. New York, 391 F.3d 462, 468 (2d Cir. 2004).  The first consideration – the strength of the prosecution's case – is considered the "single most critical factor." United States v. Reifler, 446 F.3d 65, 87 (2d Cir. 2006) (quoting Latine v. Mann, 25 F.3d 1162, 1167-68 (2d Cir. 1994)).

The Circuit's decision in Zappulla is instructive here.  In that case, the petitioner moved to suppress his murder confession as obtained in violation of Miranda.  Zappulla, 391 F.3d at 465.  The trial court disagreed, and permitted the prosecution to introduce the statement at trial. Id.  On appeal, the Appellate Division found that the written confession should have been suppressed, but concluded that the error was harmless.  Id. at 465-66.  The district court agreed with the Appellate Division, and denied habeas relief.  Id. at 466.  The Second Circuit reversed. Id. at 468.

First, the Circuit found that the prosecution's evidence was weak.  Physical evidence failed to connect Zappulla to the crime, and eyewitness testimony was suspect, at best.  Id. at 470.  The prosecution's witnesses were Zappulla's cell mate, to whom he purportedly confessed, and an acquaintance of Zappulla described by the court as "an unsavory character" with a checkered criminal history, and whose presence around the time of the murder rendered him a suspect in the crime.  Id. at 468-71.  Motel surveillance tapes submitted as evidence "merely

---

error analysis determinations are reviewed.  See Williams v. Smith, No. 10 Civ. 03043 (JG), 2011 WL 96735, at *19 n.6 (E.D.N.Y. Jan. 11, 2011).

established the undisputed fact that Zappulla stayed at the motel with [the victim]." Id. at 469.

Second, the Circuit found persuasive the fact that Zappulla's first trial resulted in a hung jury, thus "indicat[ing] that the evidence was not so overwhelming that the outcome of trial was preordained." Id. at 471. Perhaps more important, however, was that Zappulla's confession was not cumulative because it provided the only evidence of motive – a key element of the crime. Id. at 472-73. In the end, the Circuit concluded that the prosecution's case was "marred with discrepancies, inconsistencies, unreliable and conflicting testimony, shoddy forensic evidence, and logical gaps." Id. at 474.

The same cannot be said here. Unlike in Zappulla, fingerprint evidence, credible eyewitness testimony, and modus operandi evidence all connected Graham to the crimes on which he was convicted.

### a. The Overall Strength of the Prosecution's Case

#### i. Crimes Without Confessions

As a threshold matter, Graham was convicted of seven crimes to which he did not confess: two counts of forgery in connection with cashing the Sims check at Citibank, three counts of burglary at 233 Fifth Avenue, and one count each arising from the burglaries at the Cooper residence and the Bookings Group. Trial Tr. IV: Verdict at 4434:6-4437:10.

Graham's conviction for the burglary at the Bookings Group – the crime that led to his arrest – was supported by ample evidence. At the scene of the crime, Graham left a bag containing his social security card and New York State public benefits card. Trial Tr. II: Barnaba at 1132:6-20, 1134:16-1136:20; Id.: Gogarty at 1205:25-1207:8. The bag also contained electronic equipment belonging to the Bookings Group. Id. Thus, it was reasonable for the jury to infer that the bag belonged to Graham and that he committed the burglary.

The trial record also includes testimony by police connecting Graham to the crime. Officers Gogarty and Yasinsky testified that Graham sat on the ledge of the Bookings Group conference room, jumped to the adjacent rooftop, and attempted to evade capture by climbing down the fire escape. Trial Tr. III: Gogarty at 1169:1-1181:4; id.: Yasinsky at 1384:6-1388:7. Although Gogarty lost sight of Graham after he descended the staircase, Officer Gahn testified that he observed Graham emerge from the building on the street level, and that Graham "looked [him] right in the face" before running in the opposite direction. Id.: Gahn at 1308:12-1309:20. Gahn stated that the lighting condition was "like daylight" since it was "a-half a block off of Times Square." Id. at 1310:4-14.

Similarly, Officer Tricoli observed Graham scale the chain-linked fence on 46th Street, id.: Tricoli at 1371:3-8, 1372:25-1373:8, and Officer Hourican found Graham in the crawl space inside the church. Id.: Hourican at 1471:22-1474:11. The continuous, uninterrupted pursuit of Graham by police provided evidence – entirely independent of Graham's confession – linking him to the Bookings Group burglary. See, e.g., Robinson v. Mazzuca, No. 01 Civ. 0001 (LTS) (JCF), 2002 WL 31246535, at *6 (S.D.N.Y. Oct. 7, 2002) (unreliable identification evidence harmless error where police chase resulted in capture of defendant).

Graham suggests that Officers Gogarty and Yasinsky provided less than truthful testimony when they identified him as the individual on the window sill, but I find no basis for that assertion. Pet'r Mem. of Law at 91-92. Gogarty testified that Graham "turn[ed] to face" the officers as he sat on the window sill, and that the officers shined their flashlights on Graham for about thirty seconds. Trial Tr. II: at 1173:18-1176:7. Gogarty also saw Graham "face-to-face" after he jumped to the adjacent rooftop. Id. at 1179:4-11.

Finally, Graham argues that the officers' testimony is uncorroborated because Barnaba,

the business manager for the Bookings Group, did not identify Graham as the individual on the window sill.  Pet'r Mem. of Law at 91.  But the officers directed Barnaba to remain in the hallway while they surveyed the office, and therefore Barnaba could not possibly have witnessed the activity ensuing inside.  Trial Tr. II: Barnaba at 1127:13-1129:22.

The forgery convictions were supported by Fields's testimony that the photograph of the man on the New York State public benefits card was the same man who cashed the Sims & Associates check.  Trial Tr. III: Fields at 2760:6-25, 2778:23-2779:14.  Fields photocopied the card – the same card later found at the Bookings Group – and it was entered into evidence.  Id. at 2768:23-2769:14, 2778:21-2779:10.

Video evidence and eyewitness testimony linked Graham to the burglaries at 233 Fifth Avenue.  Specifically, security videos showed Graham walking on the third, fourth, and fifth floors of the building late at night, when the building was closed.  Trial Tr. III: R. Garcia at 2665:7-2667:2-13.  Security director Rodrigo Garcia testified that the man who approached him on the eve of the burglary was the same man in the video.  Id.  The jury had the opportunity to view the videotape, and decide for itself whether the individual depicted in the videotape matched the defendant who stood before them in court.  Id. at 2657:4-2658:21, 2659:23-2661:3.

Finally, the conviction for the burglary at the Cooper residence was supported by fingerprint evidence.  After discussing his experience and training, Detective Vacchio of the Latent Print Unit explained the process by which latent fingerprints are matched to those of possible suspects, and his conclusion that the palm prints lifted from the Coopers' bathroom matched Graham with ten points of identification between the latent fingerprint and Graham's ink fingerprint.  Trial Tr. IV: Vacchio at 3757:4-9, 3814:6-3817:14.  The prints were verified by a second fingerprint analyst.  Id. at 3821:9-21.

Moreover, Perry Cooper testified that he did not know Graham, and that he did not give him permission to enter his home.  Trial Tr. III: Cooper at 2307:8-2308:5.  The only explanation for Graham's fingerprint at the Cooper residence was that he burglarized the premises.  "In cases where fingerprints found at the scene of the crime are the only evidence of a defendant's guilt, . . . a reasonable juror may find guilt beyond a reasonable doubt as long as the evidence indicates that the imprinted object was generally inaccessible to the defendant except during the commission of the crime."  Torres v. Fischer, No. 03 Civ. 3862 (DAB) (GWG), 2004 WL 50871, at *6 (S.D.N.Y. Jan. 12, 2004) (internal quotations omitted) (evidence sufficient to establish guilt where defendant's prints found on objects that held stolen jewelry, and defendant not permitted access into victim's home); see also Steele v. Duncan, No. 03 Civ. 477 (HB), 2004 WL 2334074, at *4-5 (S.D.N.Y. Oct. 14, 2004) (defendant's fingerprint on wine box in area inaccessible to public sufficient to support murder and burglary convictions).

ii.   The Confessed Crimes

The confessed crimes were supported by equally compelling evidence.  Graham was convicted of six burglaries to which he confessed: the Levin residence, the Sutel residence, the Mossavar-Rahmani residence, the Dwight School, the Ukrainian Institute, and the Ramaz School.[5]  See Trial Tr. IV: Verdict at 4434:6-4437:10.  Fingerprint evidence connected Graham to the burglaries at the Sutel residence and the Ukrainian Institute.  Again, Vacchio testified as to the unique characteristics of the fingerprints recovered at both crime scenes.  See Trial Tr. IV: Vacchio at 3465:22-3769:6.  Vacchio noted "at least ten" points of identification between Graham's fingerprint and the right thumb print lifted from the Sutel residence.  Id. at 3782:1-22, 3823:7-3824:20.  The middle finger print lifted from the Ukrainian Institute resulted in "at least

---

[5] Graham was also convicted of the burglary at the Sauthoff residence, but the Appellate Division vacated that conviction.  Graham, 48 A.D.3d at 266-67.

- 36 -

eight point[s] of identification" between the latent fingerprint and Graham's fingerprint. Id. at 3781:1-11, 3794:1-22. The fingerprint evidence alone was sufficient to support Graham's conviction, particularly since it was subject to cross-examination and the jury was free to accept or reject the testimony that Graham's fingerprints matched.

In addition to physical evidence connecting Graham to the crime scene, Sutel identified Graham at a police-arranged line-up only five days after his home had been burglarized. Trial Tr. IV: Sutel at 3074:8-21. Sutel had an unobstructed view of the perpetrator standing before him, noting that he turned on the light when he walked into his living room, and that he and Graham stared at one another "for a few seconds." Id. at 3035:9-17, 3040:2-25. Sutel identified Graham at trial, and the jury was entitled to credit his identification. Id. at 3041:4-10. The strength of the identification testimony and the fingerprint evidence placing Graham at the Sutel residence, and the fingerprint evidence at the Ukrainian Institute provided persuasive evidence of guilt.

Finally, Graham's convictions for the burglaries at the Levin residence, Mossavar-Rahmani residence, the Dwight School, and the Ramaz School were supported by modus operandi evidence, which established a common pattern among all of the burglaries. Under New York law, "when the evidence of the other crimes is relevant to an issue other than the defendant's criminal tendency, it may be admitted on the basis of an exception to the general rule, but only for the limited purpose for which it is relevant." People v. Beam, 57 N.Y.2d 241, 250, 455 N.Y.S.2d 575, 580 (N.Y. 1982). If the crimes are sufficiently "unique," the trial court may give a modus operandi charge and a limiting instruction that the jurors are not to commingle the evidence. Id. at 251, 455 N.Y.S.2d at 580; see also People v. Bryant, 258 A.D.2d 293, 295, 685 N.Y.S.2d 194, 194 (1st Dep't 1999) ("[I]nasmuch as defendant's modus operandi was

sufficiently unique, the court properly instructed the jury to consider the similarities between the various incidents on the issue of identity, while also cautioning it not to otherwise commingle the evidence."). Accordingly, the trial court instructed the jury to "[w]eigh the evidence separately and independently as to each charge. Don't infer that the defendant is guilty of any of the charges just because he's charged with many crimes or you think proof of one crime shows that he's – that he has a propensity to commit that kind of crime . . ." Trial Tr. IV: Jury Charge at 4373:1-7.

Here, the burglaries for which Graham was convicted shared several distinct qualities. All of the burglaries occurred late at night, usually while residents slept. Detective Hackett testified that most residential burglaries occur during the day, and thus late-night and early morning burglaries are rare. Id.: Hackett at 3405:6-14. Six burglaries resulted in the theft, or attempted theft, of electronic equipment (233 Fifth Avenue, the Levin residence, the Mossavar-Rahmani residence, the Dwight School, the Sutel residence, and the Bookings Group); three burglaries involved breaking into safes (233 Fifth Avenue, the Ramaz School, and the Mossavar-Rahmani residence); and the perpetrator pilfered food during the course of six burglaries (233 Fifth Avenue, the Levin residence, the Dwight School, the Ukrainian Institute, the Ramaz School, and the Mossavar-Rahmani residence). See Lyons Decl. Ex. A.

Similarly rare is that nearly all of the burglaries involved entry or exit by way of fire escape, window, scaffolding, or rooftop.[6] Graham's superior acrobatic ability – as exhibited

---

[6] The burglar entered the Levin residence, 233 Fifth Avenue, the Mossavar-Rahmani residence, and the Ukrainian Institute by way of scaffolding. See Trial Tr. III: R. Levin at 1904:13-1905:15; Id.: Jackson at 2852:24-2853:1; Id.: Larick at 2501:20-2508:21; Id.: A. Leschchenko at 1535:8-23, 1538:21-1539:1. The burglar entered the Dwight School via a second floor window, the Cooper residence via a fifth floor window, and entered and exited the Sutel residence through a fifth-floor fire escape. Id.: Gelfand at 2027:18-2028:10; Id.: Cooper at 2306:25-2307:6; Trial Tr. IV: Sutel at 3054:6-3056:20. Finally, the burglar leapt out of a

during the police chase that led to his capture – was consistent with the profile developed by police, and described by eyewitnesses, of an agile perpetrator with an athletic physique. Trial Tr. IV: Hackett at 3404:16-3405:23, 3407:20-22. Graham challenges the uniqueness of this pattern, stating that "entry via a scaffold appears to be a fairly-obvious means of illegal entry that could be accomplished by any reasonably healthy burglar." Pet'r Mem. of Law at 81. While that may be true, the jury was entitled to rely on this characteristic as evidence of a common scheme or plan.

Graham also argues that food was not pilfered at the Stern-Rein, Levin, Cooper, Sauthoff, Sutel, Ramaz School, or Bookings Group burglaries, but this claim is unavailing. Id. at 80 n. 32. First, he was acquitted of the burglaries at the Stern-Rein and Levin residences. Trial Tr. IV: Verdict at 4434:6-4437:10. Second, the perpetrator was interrupted during the course of the burglaries at the Cooper residence, the Sutel residence, and the Bookings Group. See Trial Tr. III: Cooper at 2290:6-11, 2290:25-2292:7; Trial Tr. VI: Sutel at 3033:9-24, 3035:9-22; Trial Tr. II: Barnaba at 1124:18-1126-14. And third, the burglar drank bottles of water at the Ramaz School. Trial Tr. III: Olivo at 1670:20-1675:14; Id.: W. Garcia at 1709:8-22; Id.: Loffredo at 1762:5-20.

In addition to modus operandi evidence, the prosecution connected Graham to the burglaries at the Mossavar-Rahmani apartment and the Dwight School by tracing phone calls made to Graham's mother to cellular phones stolen during those burglaries. Trial Tr. III: Kleiner at 2700:21-2701:23; Id.: Bartkus at 2061:9-2062:17; Trial Tr. IV: Clancy at 3368:19-3369:6.

**b. The Prosecution's Conduct With Respect to the Wrongly Admitted Evidence**

The prosecution realized the importance of the wrongly admitted evidence, as it referred

---

window ten feet across an alley, and three stories below the seventh floor of the Bookings Group. Trial Tr. II: Gogarty at 1172:20-1173:1, 1176:11-23, 1177:17-1178:14; Id.: Yasinsky at 1385:12-1386:10, 1387:5-1388:1.

to the written confessions at length during its opening statement and at summation. See Trial Tr. II: Prosecution Opening at 1044:17-1047:7; Trial Tr. IV: Prosecution Summation at 4144:5-4147:28, 4159:10-4163:13, 4168:2-4172:11, 4194:17-4195:21, 4210:18-4211:8, 4212:10-4213:10, 4217:11-4218:19, 4220:18-23, 4247:20-4248:19, 4292:4-4294:3, 4300:3-4307:22, 4310:5-11. Nonetheless, the overall strength of the prosecution's case outweighs its conduct. See, e.g., United States v. Ivejaz, 568 F.3d 88, 98 (2d Cir. 2009) (admission of wrongfully admitted evidence harmless error where prosecution discussed evidence at summation, but properly admitted evidence was strong); Fuentes v. Ebert, No. 06 Civ. 5813, 2009 WL 1755500 at *16 (S.D.N.Y. June 22, 2009) ("[T]he strength of the evidence against Petitioner militates against any finding that the prosecutor's remarks in summation, even if inappropriate, caused Petitioner actual prejudice.").

### c. Importance of the Statements

As noted, the trial court instructed the jury to "[w]eigh the evidence separately and independently as to each charge. Don't infer that the defendant is guilty of any of the charges just because he's charged with many crimes or you think proof of one crime shows that he's -- that he has a propensity to commit that kind of crime . . ." Trial Tr. IV: Jury Charge at 4373:1-7. That the jury followed the court's instructions is clearly evidenced by the fact that it acquitted Graham of five crimes to which he had confessed. Id.: Verdict at 4434:3-4437:10. Indeed, the evidence supporting those crimes was weak. The identification testimony with respect to the Levine burglary was questionable, at best. Trial Tr. III: J. Levine at 2197:7-20; Id.: T. Levin at 2090:3-6, 2117:6-2120:22, 2122:5-25. The prosecution presented no identification testimony as to the other crimes, and none of these crimes were supported by fingerprint, videotape, or other evidence.

- 40 -

The acquittals, combined with the fact that the jury deliberated for three days, suggests that it attributed little weight to the confessions and, instead, carefully and independently considered the evidence as to each count and followed the court's limiting instructions. See United States v. Snype, 441 F.3d 119, 129-30 (2d Cir. 2006) ("[T]he law recognizes a strong presumption that juries follow limiting instructions."); see also Bryant v. Bennett, No. 00 Civ. 5692, at *6 (AGS) (AJP), 2001 WL 286776 (S.D.N.Y. March 2, 2001) (defendant's acquittal of one of the crimes charged demonstrated that jury did not commingle evidence).

### d. Whether the Statements Were Cumulative of Properly Admitted Evidence

Finally, the confessions were also cumulative of properly admitted evidence. Unlike in Zappulla, the confessions did not go to an element of the crimes with which Graham was charged and, as discussed, independent evidence connected Graham to all of the crimes on which he was convicted. Graham's fingerprints were found at three crime scenes (Ukrainian Institute, Sutel residence, and Cooper residence), his image was captured on surveillance tapes at two locations (233 Fifth Avenue and Ramaz School), he used cellular phones stolen during two burglaries to call his mother (Dwight School and Mossavar-Rahmani residence), his identification cards were present at two others (Citibank and Bookings Group), and an eyewitness placed him at a tenth location (Sutel residence).

On the record before the Court, I cannot find that Graham suffered a "substantial and injurious effect" from the trial court's failure to suppress the written confessions, or that the Appellate Division acted unreasonably in finding that the errors were harmless.[7]

---

[7] Respondent argues that "the writ should . . . be denied under the 'concurrent sentence doctrine' . . . should this Court decide that there is a basis to vacate some, but not all, of the . . . thirteen convictions." Resp. Mem. of Law at 48 (citing Padilla v. Mann, No. 92 Civ. 6642 (MGC), 1994 WL 542247 (S.D.N.Y. Oct. 04, 1994)). Respondent's reliance on the concurrent sentence doctrine is misplaced. Under the doctrine, a "court may decline to review 'a conviction for which an appellant's sentence runs concurrently with that for another, valid conviction'

### 3.  Harmlessness of Confessions as to Sentencing Claim is Not Reviewable

Graham argues that the admission of the confessions was not harmless with respect to sentencing, and that he is entitled to a new sentencing proceeding if this Court reverses any of the convictions because the trial court "explicitly relied on the combined impact of [his] multiple burglary convictions." Pet'r Mem. of Law at 92.

The sentence received by Graham was permissible under the persistent felony offender statute, N.Y.P.L. § 70.10, discussed more fully below, infra, section III(C). Justice Yates first adjudicated Graham a persistent felony offender because he had four uncontested, prior felony convictions. Appx. at A76:16-18, A82:3-9, A49. The court then considered whether the "background and nature and circumstances of the crimes" warranted an enhanced sentence. Appx. A82:1-2. The court ultimately imposed a sentence of 25 years to life for each count, a range permissible under the statute. See N.Y.P.L. § 70.10(2); N.Y. Crim. Proc. Law § 400.20(2).

Graham fails to identify the federal right violated by the sentence imposed, but by arguing that the "combined impact" of the convictions affected the length of the sentence, he essentially raises an excessive sentence claim under the Eighth Amendment.[8]  It is well-settled

-----

where the government demonstrates that the 'risk of collateral consequence is too slight to justify review.'" United States v. Shapiro, 107 F.3d 5, at *2 (2d Cir. 1997) (quoting United States v. Vargas, 615 F.2d 952, 960 (2d Cir. 1980)).  Accordingly, a federal habeas court may decline to review the merits of a petition where the petitioner challenges a conviction for which he serves a concurrent sentence, but does not challenge the remaining convictions.

The doctrine is inapplicable here because Graham challenges the constitutionality of all of the convictions, and the concurrent sentence itself. See Pet'r Reply Mem. at 13.  Thus, Serrano v. Smith, No. 05 Civ. 1849 (KTD), 2007 WL 4591965 (S.D.N.Y. Dec. 21, 2007), cited by Respondent, is not on point.  In Serrano, the court declined to review the merits of the petition, which challenged the constitutionality of a single robbery conviction, but not the three burglary convictions. Id. at *1.  See also Shapiro, 107 F.3d at *1 (declining to review one of several convictions where the "overall sentence would remain unchanged.").

[8]  On direct appeal, Graham argued that "the sentence of 25 years to life imprisonment was excessive."  Petition at 9(f); Appx. A223.  Although his memorandum of law in support of the Petition does not frame the issue in these terms, the Court can only surmise that he advances the

that such claims are not subject to habeas review.  White v. Keane, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."); see also Ross v. Gavin, 101 F.3d 687, at *1 (2d Cir. 1996); Bell v. Ercole, 631 F. Supp. 2d 406, 418 (S.D.N.Y. 2009) (same).

Because Graham does not argue that the sentence falls outside the range permitted by New York law, his sentencing claim is not cognizable on habeas review.[9]  Ross, 101 F.3d at *1. Garrett v. Smith, No. 05-CV-3374 (JFB), 2006 WL 2265094, at *12 (E.D.N.Y. Aug. 8, 2006).

## B.   Voluntariness of Confessions Claim

The Petition explicitly challenges the voluntariness of the confessions.  See Pet. at 6. However, in his memorandum of law, Graham presents the claim as an alternate avenue of relief, arguing that, "[s]hould th[e] Court agree . . . that the wrongful admission of his oral and written confessions was not harmless," it should hold a hearing to permit Graham to develop facts regarding the voluntariness of his confessions.  Pet'r Mem. of Law at 94-95; Pet. at 6.  The Court need not address this argument, however, because Respondent does not challenge the Appellate Division's determination that the trial court should have suppressed the confessions, see Resp. Mem. of Law at 50 n.19,[10] and because the admission of the confessions was harmless. See supra, section III(A).

_____

same arguments here, as the memorandum barely argues the point.  See Pet'r Mem. of Law at 92-93.

[9] Moreover, it does not follow that vacating certain convictions results in a reduction in the length of the sentence as to the convictions left intact.  This is particularly true given the threshold determination that Graham's prior convictions rendered him a persistent felony offender, and therefore a conviction for even one robbery permitted the trial judge to impose the length of 25 years to life.  Appx. at 49-50.

[10] Indeed, Graham does not advance the point in his reply papers.  See Reply Memorandum of Law in Support of Petition Under 28 U.S.C. § 2254 for a Writ of Habeas Corpus (Doc. No. 17).

- 43 -

### C. Persistent Felony Offender Status Claim

Graham was sentenced under New York's persistent felony offender statute, N.Y. Penal Law § 70. 10, which he asserts violates the Sixth Amendment, as interpreted by the Supreme Court in Apprendi v. New Jersey, 530 U.S. 466 (2000). Pet. at 9; Pet'r Mem. of Law at 101.

#### 1. Standard of Review

The AEDPA prohibits a federal court from granting habeas relief unless the petitioner shows that the state court decision "'involved an unreasonable application of' federal law, or that it "was based on an unreasonable determination of the facts" in light of the record before the state court." Harrington v. Richter, -- U.S. --, 131 S. Ct. 770, 784 (2011) (quoting 28 U.S.C. §§ 2254(d)(1), (d)(2)). For the purposes of federal habeas review, "clearly established" federal law refers to the decisions of the Supreme Court. Premo v. Moore, --- U.S. ---, 131 S. Ct. 733, 737 (2011). Such rules are established in the "holdings, as opposed to the dicta, of th[e] Supreme Court's decisions." Williams v. Taylor, 529 U.S. 362, 412 (2000).

A state court decision is "contrary to" clearly established law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Id. at 412-13. A state court decision involves an "unreasonable application" of clearly established law under the second clause of § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. 529 U.S. at 413. Additionally, a state court unreasonably applies Supreme Court precedent "if the state court unreasonably extends a legal rule established by the Supreme Court or if it unreasonably fails to extend a legal rule to a context in which the rule reasonably should apply." Serrano v. Fischer,

412 F.3d 292, 296-97 (2d Cir. 2005).

The Supreme Court has emphasized that "'an unreasonable application of federal law is different from an incorrect application of federal law.'" Renrico v. Lett, — U.S. —, 130 S. Ct. 1855, 1862 (2010) (quoting Williams v. Taylor, 529 U. S. 362, 410 (2000)). "'[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. (quoting Williams, 529 U.S. at 411). Instead, "that application must be 'objectively unreasonable.'" Id. (quoting Williams, 529 U.S at 409). "If none of these conditions is met, even if the federal court would have reached a different conclusion on direct review, the petition must be denied." Portalatin v. Graham, 624 F.3d 69, 79 (2d Cir. 2010), cert. denied, --- S.Ct. ---, 2011 WL 196837 (Mar. 21, 2011). It should be noted that AEDPA "sets forth a precondition to the grant of habeas relief . . . not an entitlement to it." Frye, 551 U.S. at 120.

### 2. Clearly Established Federal Law

Here, the clearly established federal law is governed by Apprendi v. New Jersey, 530 U.S. 466 (2000), and its progeny. Accordingly, the question is whether the Appellate Division unreasonably applied Apprendi in adjudicating Graham a persistent felony offender.

In Apprendi, the Supreme Court struck down a New Jersey hate crime statute that enhanced a sentence if the trial judge found that the defendant possessed a weapon "with a purpose to intimidate an individual or group," based on the victim's characteristics. Id. at 474, 491. The Court reasoned that the statute violated the Sixth Amendment because it required the sentencing judge to make a finding of fact as to an element of the offense, a role exclusively within the purview of the jury. Id. at 492-95. The Court enunciated the bright-line rule that

"[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Id. at 486 (emphasis added). See also Ring v. Arizona, 536 U.S. 584, 609 (2002) (striking down Arizona statute permitting trial judge to find "enumerated aggravating factors" that were "functional equivalent of an element of a greater offense") (internal quotations omitted).

Critically, Apprendi recognized an exception to the rule for sentencing enhancements triggered by a defendant's prior conviction, and reaffirmed its prior holding in Almendarez-Torres v. United States, 523 U.S. 224, 243-45 (1998), that findings of fact with respect to recidivism can be made by a trial judge. Apprendi, 530 U.S. at 496. The Court distinguished recidivist sentencing statutes by noting that "procedural safeguards attached to any 'fact' of prior conviction, and the [defendant's failure to] challenge the accuracy of that 'fact' in his case, mitigate[] the due process and Sixth Amendment concerns otherwise implicated in allowing a judge to determine a 'fact' increasing punishment beyond the maximum of the statutory range." Id. at 488. See Almendarez-Torres, 523 U.S. at 243 ("[R]ecidivism [] is a traditional, if not the most traditional, basis for a sentencing court's increasing an offender's sentence.").

Subsequently, in Blakely v. Washington, 542 U.S. 296 (2004), the Supreme Court clarified that "the statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." Id. at 303 (emphasis in original). In Blakely, the defendant pled guilty to second-degree kidnapping, which carried a maximum penalty of 10 years. Id. at 300. After hearing the victim's testimony at the plea allocution, however, the trial judge issued 32 findings of facts – including that the defendant acted with deliberate cruelty – and enhanced his sentence an

additional 37 months pursuant to Washington's sentencing scheme.  Id. at 301-02.  Applying Apprendi, the Supreme Court overturned the statute because it permitted the trial judge to find facts "neither admitted by petitioner nor found by a jury."  Id. at 303.

In affirming the principles of Apprendi with respect to judicial fact-finding at the sentencing phase, the Supreme Court repeatedly has reaffirmed the Almendarez-Torres exception, eliminating any doubt as to the constitutionality of recidivist sentencing statutes.  See United States v. O'Brien, 130 S. Ct. 2169, 2174 (2010) ("Though one exception has been established, see Almendarez-Torres v. United States, (citation omitted) '[i]t is unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed.") quoting Apprendi, 530 U.S. at 490); James v. United States, 550 U.S. 192, 214 n.8 (2007) ("To the extent [defendant] contends that the simple fact of his prior conviction was required to be found by a jury, his position is baseless. [Defendant] admitted the fact of his prior conviction in his guilty plea, and in any case, we have held that prior convictions need not be treated as an element of the offense for Sixth Amendment purposes."); Cunningham v. California, 549 U.S. 270, 288-89 (2007) ("Except for a prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); United States v. Booker, 543 U.S. 220, 244 (2005) ("[W]e reaffirm our holding in Apprendi: Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt.") (emphasis added).

3.  The New York Persistent Felony Offender Statute

Section 70.10 of the N.Y.P.L requires that the sentencing court engage in a two-step

- 47 -

analysis before imposing an enhanced sentence.  First, the court must adjudicate the defendant a

persistent felony offender.  Id. at § 70.10(a)(1).  This requires that the prosecution prove beyond

a reasonable doubt that the defendant has two prior felony convictions for which he was

sentenced to "imprisonment in excess of one year" and for which he was imprisoned "prior to the

commission of the present felony."  N.Y. Crim. Proc. Law § 400.20(1)(a), (5).

Next, the court must decide whether the "history and character" of the defendant and the

"nature and circumstances of his criminal conduct are such that extended incarceration and

lifetime supervision of the defendant are warranted to best serve the public."  N.Y. Crim. Proc.

Law § 400.20(1), (5).  If the court answers this question in the affirmative, then it may impose a

class A-I sentence – an indeterminate sentence, with a minimum term of between fifteen and

twenty-five years, and a maximum term of life in prison.  N.Y.P.L. § 70.10(2); N.Y. Crim. Proc.

Law § 400.20(2).

### 4.  Graham Was Properly Adjudicated and Sentenced A Persistent Felony Offender

In April 2010, in a consolidated appeal of five habeas petitions, the Second Circuit

concluded that the New York persistent felony offender statute, N.Y.P.L. § 70.10, violated the

Sixth Amendment, and that the New York courts unreasonably applied clearly established

Supreme Court precedent in holding otherwise.  Besser v. Walsh, 601 F.3d 163, 189 (2d Cir.

2010).  The Second Circuit subsequently ordered a rehearing en banc.  Portalatin, 624 F.3d at 78.

In Portalatin, the Circuit vacated its prior decision, and held that the statute does not run afoul of

the Supreme Court's holdings in Apprendi and its progeny.  Portalatin, 624 F.3d at 90-94.

In so holding, the Second Circuit reiterated the recidivism exception to Apprendi: "any

facts that the sentencing judge considered beyond those respecting recidivism do not implicate

the Sixth Amendment, for they did not — and could not — lead to a sentence in excess of that

- 48 -

Apprendi maximum." Id. at 91.  The court emphasized that the second step of the New York

persistent felony offender statute operates "as a procedural requirement that informs only the

sentencing court's discretion . . . unlike the factfinding requirements invalidated in Blakely and

Cunningham." Id. at 91.  Thus, although the New York statute permits the imposition of a

sentence in excess of the statutory maximum, it does not call for judicial fact-finding regarding

an element of the offense.

     In sum, the application of the New York persistent felony offender law to Graham did not

violate his Sixth Amendment rights.  In light of Portalatin, 624 F.3d 69, I recommend that

Graham's Apprendi claim be denied.  See West v. Breslin, No. 08-0274-PR, 2011 WL 441182,

at *1 (2d Cir. Feb. 9, 2011) (summary order) (affirming denial of habeas petition challenging

New York State persistent felony offender statute); Gibson v. Artus, No. 08-1576, 2010 WL

4342198, at *2 (2d Cir. Nov. 3, 2010) (summary order) ("[T]he claim that New York's persistent

felony offender statute violated petitioner's right to a jury trial under the Sixth Amendment is

without merit.").

## IV.   CONCLUSION

     For the foregoing reasons, I recommend that Graham's petition for a writ of habeas

corpus be DENIED.  Further, I recommend that the Court decline to issue a certificate of

appealability pursuant to 28 U.S.C. § 2253(c)(1)(A), because Graham has failed to make "a

substantial showing of the denial of a constitutional right."  Id. § 2253(c)(2); see generally

United States v. Perez, 129 F.3d 255, 259-60 (2d Cir. 1997).

**PROCEDURES FOR FILING OBJECTIONS**

     Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report to file written

- 49 -

objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Richard Owen, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Judge Owen.  **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) (citing Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) and Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  If Petitioner does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Respondent's counsel.  See Lebron v. Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
   April 15, 2011

                JAMES L. COTT
                United States Magistrate Judge

**Copies mailed to:**

Hon. Richard Owen

Abigail Everett
Robert S. Dean
Center for Appellate Litigation
74 Trinity Place
11th floor
New York, NY 10006

212-577-2523
Fax: 212-577-2535

Paul Bernard Lyons
New York State Office of the Attorney General
120 Broadway
New York, NY 10271
(212)-416-8229
Fax: (212)-416-8010